## Owca *v.* Owca, Appellant.

416

Argued March 6, 1944. Before KELLER, P. J., BALD-
RIGE, RHODES, HIRT, KENWORTHEY, RENO and JAMES, JJ.

*G. W. Ellis,* with him *A. M. Lucks,* for appellant.

*Joseph.V. Phillips,* for appellee.

OPINION BY JAMES, J., July 15, 1944:

On January 12, 1943, Walter Owca petitioned for a divorce from his wife on the grounds of cruel and barbarous treatment and indignities to the person. The case was tried before EAGEN, J., who granted a final decree in divorce on the grounds of indignities to the person; hence this appeal by the wife, contending that the evidence was insufficient to sustain the decree.

As is our duty, in the absence of a jury trial, we have examined and weighed the evidence for the purpose of arriving at an independent conclusion upon the fundamental question in every divorce proceeding: whether the libellant has supported any of the grounds set forth in the libel by clear and convincing proof.

The testimony in this case having been taken in open court, and the learned judge before whom the witnesses

appeared having had an opportunity to observe their manner of testifying, and the evidence produced by libellant and his witnesses being clearly sufficient to warrant the entry of a decree appealed from, the findings of fact by the court below are entitled to respectful consideration ...... and should not be lightly disturbed on appeal. *Evans v. Evans,* 152 Pa. Superior Ct. 257.

The parties were married on June 28, 1926 and have two children, a daughter aged 16 and a son aged 13 years. Apparently they lived normal lives until 1935 when the conduct of the wife began which ended in this proceeding.

The husband's testimony was generally supported by the two children and the clerk of the police court, while respondent's testimony as to her behavior was not corroborated. Her witnesses testified largely as to the conduct of the husband in taking some neighbor woman in his automobile while on his way to and from his work, from which it was to be inferred that he was guilty of misconduct.

In 1935 respondent began a sad course of excessive drinking which resulted in her involuntary presence in the Scranton Police Court eleven times on the charge of drunkenness and disorderly conduct. On three occasions she was committed to the Hillside Home, on one occasion to the County Jail for fifteen days, and on one occasion sent to a hospital. Two of the arrests were made at beer gardens, two on public highways and the others at her home.

According to libellant's testimony, during the years 1935, 1936, 1937 to 1940, he was called to take his wife from beer gardens or drinking parties, during which time respondent neglected her home and family and on one occasion hit him with a milk bottle requiring two stitches.

In January, 1941 he left his home and did not return

until June 20, 1942, during which period libellant was under a court order to support his wife and children. Soon after his return, on June 20, 1942, respondent renewed her misconduct, quarreling, cursing and calling respondent vile and obscene names.

On October 16, 1942, respondent was arrested and committed to the county jail for fifteen days and upon her discharge was re-arrested and sent to a hospital for two weeks.

On January 2, 1943, at about nine-thirty P. M. occurred the incident which finally resulted in the libellant again leaving his home. Libellant testified as follows: "A. Well, this was continuing from the time—from about 9:30—from the time I came from work. She went out for about an hour, hour and a half, and then she came back, and she was still continuing arguing and picking up things and throwing at me. She threw a cuspidor at me when I was sitting on the kitchen rocking chair, and she threw it right through the window, which I didn't think until later I was going to save myself. And she started arguing again, started trying to hit me with a grate poker. But later, about after 12 o'clock, she come over, I probably dozed off, and she hit me with the grate poker, and when I got up I saw blood in my hand; and she had me all bumped up over here (indicating); and I had four stitches put on the head, right over here (indicating); and a mark over here. Q. And did this happen when you were in bed? A. January 2nd, the night of January 2nd. Q. When she hit you, were you in bed at that time? A. I was in bed. I was laying in bed when she hit me the first time. Then she hit me several times later. Q. Did you strike her? A. Well, I was just trying to protect myself until the children, the girl, went over and called the police. And they took us both to city hall. The arresting officer said: 'Well, you'll have to go with us, because you need medical attention, anyway.' So he

took us to the West Side Hospital; and that's where they stitched me up. Q. What happened after that? A. Well, they took us to the city hall; spent the night over there in city hall."

The following day libellant, with his two children, left his home and since then has been living with his mother.

In respondent's testimony, she attempted to place the blame for her excessive drinking upon her husband and maintained that much of the quarrels and disagreements were caused by her efforts to discipline the daughter. Taken as a whole we find it to be evasive and far from responsive to the direct testimony of the husband and the children. As the court below said, "While she denied certain of the charges and attempted to blame the husband for their trouble, her testimony and allegations against him are weak and unconvincing."

Without deciding whether the testimony warranted a decree on the ground of cruel and barbarous treatment, it was properly considered as supporting the charge of indignities to the person. It is our judgment that libellant was entitled to the divorce.

Decree affirmed.